| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | DOCKET NO. 5:25-cr-43-MEO |
| v. | ) | |
| | ) | **SENTENCING MEMORANDUM** |
| BRENDA WYMER | ) | |
| | ) | |

NOW COMES the United States of America, by and through Russ Ferguson, United States Attorney for the Western District of North Carolina, and hereby submits this sentencing memorandum. For almost ten years, the defendant, Brenda Wymer, repeatedly and deliberately violated her fiduciary duties by misappropriating federal income, Social Security, and Medicare taxes held in trust for the United States, which she kept for herself and her business instead. Her flagrant violation deprived the Federal Government of almost $1 million in funds used to provide important retirement, disability, and health insurance benefits. There is a strong need to deter this Defendant and other tax cheats from engaging in similar conduct. Accordingly, the Government requests a within-Guidelines sentence of imprisonment "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

I.      **BACKGROUND**

On September 22, 2025, the defendant, Brenda Wymer, was charged by Bill of Information with one count of Failure to Pay Over Trust Fund Taxes, in violation of 26 U.S.C. § 7202. On October 17, 2025, the defendant pleaded guilty to the Bill of Information. On February 6, 2025, U.S. Probation issued a final Presentence Investigation Report ("PSR") which calculated a total offense level of 17 based on a tax loss of $973,727.04. The PSR fully incorporates the Factual Basis and the Statement of Relevant Conduct. Presentence Report ("PSR") (Doc. 22) at ¶¶ 5-16.

1

The Defendant was the sole owner of Haven Home Care, Inc. ("HHC"), a home healthcare services business located in Wilkesboro, North Carolina, from the start of the business in 2014. For the tax years 2015 through 2024, the Defendant failed to pay over to the Internal Revenue Service ("IRS") approximately $637,482.26 in total trust fund taxes that were withheld from the wages paid to the employees of HHC.

Employers like the Defendant are required to withhold taxes from their employees' paychecks and make payments to the Department of Treasury through the IRS. These taxes include federal income tax withholding, Social Security, and Medicare taxes. These taxes are often referred to as "Trust Fund Taxes" because employers hold them in trust until paid over to the United States. In addition to Trust Fund Taxes, employers are also required to "match" their employees' Social Security and Medicare taxes. Together, the employees' portion (*i.e.*, Trust Fund Taxes) and the employers' portion (the matching Social Security and Medicare taxes) are collectively referred to as "employment taxes." Additionally, the Social Security and Medicare taxes—(*i.e.*, employment taxes not including income tax withholdings)—are referred to as Federal Insurance Contributions Act ("FICA") taxes. The Defendant did not pay over employment taxes as she was obligated to do. Instead, she kept those tax funds for herself and her business.

Without a doubt, the Defendant was the sole owner of HHC and aware of and responsible for HHC's failure to pay these taxes to the IRS. She had the sole authority over HHC's business checking account, and for maintaining the business's books and records. She handled all major administrative functions related to payroll and did not use a third-party payroll processor. The office manager handled some portions of payroll like tallying the number of hours or units the employees worked and providing that tally to the Defendant, but the Defendant kept all payroll records in her home, and she prepared the employee Forms W-2, Wage and Tax Statements

2

("Forms W-2") and distributed them to the employees each January or February. The employees relied on the information reported on their Forms W-2 to file their income tax returns, including to claim their tax withholdings. The employees also filed the Forms W-2 with the IRS as attachments to their annual IRS Forms 1040, U.S. Individual Income Tax Returns ("Forms 1040").

The Defendant understood and was on notice of her duty to file and pay over trust fund taxes for HHC, because she had previously filed Forms 941 with the IRS on behalf of HHC for tax periods ending March 31, 2014, through December 31, 2014. She and HHC had also received various notices from the IRS, assessing interest, issuing failure to file and failure pay tax penalties, and assessing and issuing additional tax deficiency notices. Yet, for the tax periods ending March 31, 2015, through December 31, 2024, she failed to file any Forms 941 and there is no record of tax-related payments or deposits relating to HHC's tax liabilities incurred during the same periods. The Defendant also filed corporate income tax returns on behalf of HHC for tax years 2014 and 2015 but failed to file such returns for tax years 2016 through 2023.

Finally, the Defendant has previously willfully failed to pay over employment taxes at another company. An employee reported a tax-related incident that occurred prior to 2017. At that time, the Defendant operated another home healthcare company, Autum Oak Home Care, which she owned with her then-husband. The employee stated that he or she had received paychecks throughout the year with money withheld, ostensibly for trust fund taxes. However, at the end of the year, the Defendant called the employees into a meeting and explained that, although she had withheld taxes from employees' paychecks, she had not paid over the collected taxes to the IRS. Employees were given Forms W-2, later changed to Forms 1099, and a check with the amount of money to cover what they would need to pay in taxes to the IRS. The Defendant threatened the employees not to tell anyone about the issue and wrote them checks to cover their potential tax

3

liabilities after filing documents with the IRS showing them as independent contractors instead of employees.

In total, for 2015 through 2024, HHC owed a total of $973,727.04 in employment taxes comprised of $637,482.26 in trust fund taxes and $336,244.78 in matching employer contributions. The total tax was computed as follows:

| Year | Wages [b] | Federal Income Tax Withheld [c] | Social Security Tax Withheld [d] | Medicare Tax Withheld [e] | | Trust Fund Taxes Due [c]+[d]+[e] |
|---|---|---|---|---|---|---|
| **2015** | | | | | | |
| **Total Per W-3** | $ 823,108.72 | $ 57,838.00 | $ 51,032.69 | $ 11,935.06 | | $ 120,805.75 |
| | | | | | | |
| **2016** | | | | | | |
| Q1 Per QB | $ 172,279.11 | $ 13,386.00 | $ 11,600.01 | $ 2,712.90 | | $ 27,698.91 |
| Q2 Per QB | $ 194,181.09 | $ 14,997.00 | $ 13,087.03 | $ 3,060.68 | | $ 31,144.71 |
| Q3 Per QB | $ 182,319.39 | $ 14,197.00 | $ 12,078.72 | $ 2,824.88 | | $ 29,100.60 |
| Q4 Per QB | $ 168,065.37 | $ 12,676.00 | $ 10,995.33 | $ 2,571.48 | | $ 26,242.81 |
| **Total Per QB** | $ 716,844.96 | $ 55,256.00 | $ 47,761.09 | $ 11,169.94 | | **$ 114,187.03** |
| **Total Per W-3** | $ 769,852.99 | $ 55,251.00 | $ 47,761.09 | $ 11,169.94 | | **$ 114,182.03** |
| | | | | | | |
| **2017** | | | | | | |
| Q1 Per QB | 167,817.66 | 12,848.00 | 10,739.22 | 2,511.61 | | $ 26,098.83 |
| Q2 Per QB | 154,419.74 | 10,705.00 | 9,700.03 | 2,268.55 | | $ 22,673.58 |
| Q3 Per QB | 136,325.24 | 9,132.00 | 8,528.93 | 1,994.67 | | $ 19,655.60 |
| Q4 Per QB | 116,298.54 | 8,218.00 | 7,185.69 | 1,680.48 | | $ 17,084.17 |
| **Total Per QB** | 574,861.18 | 40,903.00 | 36,153.87 | 8,455.31 | | **85,512.18** |
| **Total Per W-3** | $ 595,510.13 | $ 40,903.00 | $ 36,153.87 | $ 8,455.31 | | **$ 85,512.18** |
| | | | | | | |
| **2018** | | | | | | |
| Q1 Per QB | 102,344.39 | 6,842.00 | 6,269.76 | 1,446.34 | | $ 14,558.10 |
| Q2 Per QB | 110,632.74 | 6,400.00 | 6,703.35 | 1,567.70 | | $ 14,671.05 |
| Q3 Per QB | 126,875.39 | 7,701.00 | 7,701.08 | 1,801.05 | | $ 17,203.13 |
| Q4 Per QB | 110,857.31 | 7,041.00 | 6,733.59 | 1,574.84 | | $ 15,349.43 |
| **Total Per QB** | 450,709.83 | 27,984.00 | 27,407.78 | 6,389.93 | | **61,781.71** |
| **Total Per W-3** | $ 442,061.43 | $ 27,984.00 | $ 27,407.78 | $ 6,409.93 | | **$ 61,801.71** |
| | | | | | | |
| **2019** | | | | | | |
| Q1 Per QB | 91,647.31 | 5,636.00 | 5,566.03 | 1,301.72 | | $ 12,503.75 |
| Q2 Per QB | 108,355.73 | 6,239.00 | 6,587.79 | 1,540.71 | | $ 14,367.50 |
| Q3 Per QB | 111,804.98 | 8,089.00 | 6,812.44 | 1,593.23 | | $ 16,494.67 |
| Q4 Per QB | 102,710.26 | 7,273.00 | 6,266.13 | 1,465.57 | | $ 15,004.70 |
| **Total Per QB** | 414,518.28 | 27,237.00 | 25,232.39 | 5,901.23 | | **58,370.62** |
| **Total Per W-3** | $ 406,963.01 | $ 27,252.00 | $ 25,232.39 | $ 5,901.13 | | **$ 58,385.52** |

4

|  | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **2020** | | | | | | | | |
| Q1 Per QB | 91,995.32 | 6,646.00 | 5,701.11 | 1,333.32 | | $ | 13,680.43 | |
| Q2 Per QB | 80,642.59 | 4,520.79 | 4,999.88 | 1,169.37 | | $ | 10,690.04 | |
| Q3 Per QB | 90,749.35 | 4,891.10 | 5,626.45 | 1,315.77 | | $ | 11,833.32 | |
| Q4 Per QB | 97,418.00 | 5,351.28 | 5,833.28 | 1,364.18 | | $ | 12,548.74 | |
| **Total Per QB** | 360,805.26 | 21,409.17 | 22,160.72 | 5,182.64 | | | **48,752.53** | |
| **Total Per W-3** | $ 343,815.31 | $ 24,388.97 | $ 21,441.24 | $ 5,014.39 | | $ | **50,844.60** | |
| | | | | | | | | |
| **2021** | | | | | | | | |
| Q1 Per QB | 73,068.24 | 4,050.38 | 4,530.47 | 1,059.51 | | $ | 9,640.36 | |
| Q2 Per QB | 67,927.12 | 4,210.59 | 4,213.44 | 985.35 | | $ | 9,409.38 | |
| Q3 Per QB | 67,666.69 | 4,224.69 | 4,189.59 | 979.75 | | $ | 9,394.03 | |
| Q4 Per QB | 65,297.88 | 4,257.07 | 4,050.47 | 947.14 | | $ | 9,254.68 | |
| **Total Per QB** | 273,959.93 | 16,742.73 | 16,983.97 | 3,971.75 | | | **37,698.45** | |
| **Total Per W-3** | $ 265,334.25 | $ 16,582.86 | $ 16,409.29 | $ 3,837.55 | | $ | **36,829.70** | |
| | | | | | | | | |
| **2022** | | | | | | | | |
| Q1 Per QB | 56,285.37 | 3,586.21 | 3,489.62 | 816.14 | | $ | 7,891.97 | |
| Q2 Per QB | 58,105.50 | 8,207.30 | 5,421.16 | 1,267.91 | | $ | 14,896.37 | |
| Q3 Per QB | 61,703.44 | 4,264.24 | 3,825.55 | 894.60 | | $ | 8,984.39 | |
| Q4 Per QB | 61,972.02 | 4,355.85 | 3,842.20 | 898.48 | | $ | 9,096.53 | |
| **Total Per QB** | 238,066.33 | 20,413.60 | 16,578.53 | 3,877.13 | | | **40,869.26** | |
| **Total Per W-3** | $ 272,167.49 | $ 21,540.25 | $ 16,874.40 | $ 3,946.22 | | $ | **42,360.87** | |
| | | | | | | | | |
| **2023** | | | | | | | | |
| Q1 Per QB | 59,825.03 | 3,831.74 | 3,709.17 | 867.56 | | $ | 8,408.47 | |
| Q2 Per QB | 57,401.17 | 3,659.24 | 3,532.88 | 826.34 | | $ | 8,018.46 | |
| Q3 Per QB | 64,481.72 | 3,875.67 | 4,004.10 | 930.29 | | $ | 8,810.06 | |
| Q4 Per QB | 64,464.20 | 3,749.07 | 3,760.90 | 879.81 | | $ | 8,389.78 | |
| **Total Per QB** | 246,172.12 | 15,115.72 | 15,007.05 | 3,504.00 | | | **33,626.77** | |
| **Total Per W-3** | $ 241,381.87 | $ 14,827.98 | $ 14,966.12 | $ 3,500.83 | | $ | **33,294.93** | |
| | | | | | | | | |
| **2024** | | | | | | | | |
| Q1 Per QB | 52,455.90 | 2,810.33 | 3,252.29 | 760.70 | | $ | 6,823.32 | |
| Q2 Per QB | 63,641.76 | 3,836.86 | 3,925.99 | 918.26 | | $ | 8,681.11 | |
| Q3 Per QB | 64,216.14 | 4,098.28 | 3,978.13 | 930.25 | | $ | 9,006.66 | |
| Q4 Per QB | 65,392.79 | 4,220.65 | 4,025.38 | 943.94 | | $ | 9,189.97 | |
| **Total Per QB** | 245,706.59 | 14,966.12 | 15,181.79 | 3,553.15 | | | **33,701.06** | |
| **Total Per W-3** | $ 245,683.35 | $ 14,669.42 | $ 15,232.65 | $ 3,562.90 | | $ | **33,464.97** | |
| | | | | | | | | |
| | | | | | | $ | **637,482.26** | |
| | | | | | | | | |
| | | | | Employer Portion | | | 336,244.78 | |
| | | | | Total | | | $973,727.04 | |

## II.    <u>ADVISORY GUIDELINES</u>

The PSR computed the base offense level as 20 because the loss is more than $550,000. Doc. 22 at ¶ 21 and U.S.S.G. §§ 2T1.6(a) and 2T4.1(H). The offense level is increased by two

5

levels because the Defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense. *Id*. at ¶ 24 and U.S.S.G. § 3B1.3. After reductions for acceptance of responsibility and zero-point offender, the total offense level is 17. *Id*. at ¶ 30. With a Criminal History Category of I, the Guideline imprisonment range is 24 to 30 months. *Id*. at ¶¶ 35 and 52.

The Defendant objected to the inclusion of the two-level enhancement under U.S.S.G. § 3B1.3,[1] arguing: "(a) the defendant's position of trust is an element of the offense and therefore already taken into account by the guidelines; (b) the defendant did not occupy a position of public or private trust as contemplated in the enhancement; (c) the use of the enhancement is contrary to Department of Justice guidance to tax prosecutors; and (d) the imposition of the enhancement is inconsistent with recent employment tax prosecutions in the Western District of North Carolina." Doc. 20. First, application of this enhancement is not contrary to Department of Justice guidance which merely cautions prosecutors to be aware of the circuit split and to "exercise caution." https://www.justice.gov/archives/tax/media/1385106/dl?inline at p. 21.[2] More importantly, under Fourth Circuit precedent, the Defendant's conduct is precisely the type of conduct meriting an abuse-of-trust enhancement.[3] *United States v. Barringer*, 25 F.4th 239 (4th Cir. 2022); *see also United States v. Smith*, 353 Fed.Appx. 869, 872-73 (4th Cir. 2009) (unpublished).

In 2022, the Fourth Circuit rejected the Defendant's substantive objections and upheld

---

[1] USSG §3B1.3, entitled "Abuse of Position of Trust of Use of Special Skill," provides, in pertinent part, that: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristics."

[2] Notably, the title page of the *Criminal Tax Manual* makes clear that "[t]his Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful litigative prerogatives of the Department of Justice." U.S. Dep't of Justice, Criminal Tax Manual, *available at* https://www.justice.gov/tax/media/1400766/dl?inline.

[3] The Defendant acknowledges that the Fourth Circuit has rejected her objection. *See* Doc. 20 at p. 4.

imposition of an abuse-of-trust enhancement based on the defendant's relationship with the IRS, concluding that Barringer, who "basically ran the company," occupied a position of trust "related to the delinquent payroll taxes" because of the "wide discretion accorded" to her to decide who to pay and when. *Barringer*, 25 F.4th at 255-56. Here, the Defendant's role and conduct are very similar to Barringer's. The Defendant ran HHC, was its sole owner, and maintained wide discretion of what payments were made and to whom. Indeed, it was the Defendant who had final say over whether employment tax payments were made or not made.

While two other courts of appeals, *United States v. May*, 568 F.3d 597 (6th Cir. 2009) and *United States v. DeMuro*, 677 F.3d 550 (3d Cir. 2012), have found that the abuse-of-trust enhancement does not apply in § 7202 trust fund cases on the grounds that the defendant did not occupy a position of trust vis-à-vis the IRS, the Fourth Circuit has articulated its rejection of those holdings. Indeed, the *Barringer* court found *May* "unpersuasive," criticizing its conclusion as "a non sequitur given the facts of the case," which showed that "May possessed significant discretionary authority, including the sole right to sign checks for the company." *Id*. at 256.

Similarly, the Fourth Circuit has clarified that applying the abuse-of-trust enhancement does not result in impermissible double-counting, reasoning that a hypothetical defendant could be a responsible party for § 7202 while still having minimal or limited discretion in the role. *Id*. at 258 ("While it is true that many responsible persons under § 7202 will also occupy positions of trust, being a responsible person does not ipso facto equate to holding a position of trust for USSG §3B1.3 purposes."). For example, an individual who did not own a company, and did not engage in management of the company, but was hired for the narrow purpose of submitting Forms 941 and making payroll tax payments, could be considered a responsible party for § 7202 without occupying a position of trust.

Here, however, the Defendant was not a minimal participant nor was her discretion limited; she was not akin to a bank teller or hotel clerk. She was the owner of HHC and exercised control over the business and its financial affairs, including controlling the bank accounts, deciding which bills were paid, hiring and firing employees, and signing tax returns. *See* Doc. 3 at ¶¶ 1 and 2. As such, the Defendant's "corporate role and the discharge of her duties sufficiently demonstrate that she conducted [HHC's] affairs with significant discretion and occupied a position of trust, particularly related to the delinquent payroll taxes, because her position was 'characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).'" *Barringer*, 25 F.4th at 255.

## III.     18 USC § 3553(a) SENTENCING FACTORS

The Court must consider the § 3553(a) factors in fashioning a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing. The Court must also avoid unwarranted sentencing disparities. The need for the sentence to reflect the seriousness of the offense, the nature and circumstances of the offense, the need to promote respect for the law, and to afford adequate deterrence, both specific and general, support a within-Guidelines sentence.

A.     <u>Seriousness of the Offense and the Nature and Circumstances of the Offense</u>

The Defendant's conduct was not isolated, but instead was repeated and deliberate, causing a tax loss of close to $1 million. That figure alone demands a significant sentence of imprisonment. But the dollar figure by itself does not tell the full story of the Defendant's criminal conduct. Again and again the Defendant took taxes from her employees' paychecks and spent them however she saw fit. These were not split-second decisions or poor choices made under emotional duress. Rather, the Defendant had time to consider her options every single time she calculated and wrote payroll checks, and, every time, she chose to commit her crimes. Moreover, the conduct spanned

years – giving the Defendant ample time to stop her conduct, and yet the Defendant continued to take her employees' taxes and spend it for herself and her business.

The Defendant knew her conduct was wrong. She has a long history of employment tax non-compliance, which put her on notice of her tax obligations as the responsible person. Her non-compliance with federal employment taxes began at least as early as 2014 with HHC and, based on the statement from an employee at Autum Oak Home Care, the Defendant engaged in employment tax non-compliance at her prior company. The Defendant already knew she was required to file and pay employment taxes because she had previously filed Forms 941 for HHC, but on top of that, the Defendant received notices from the IRS of her failures to file and pay tax, thereby removing any doubt that the Defendant knew of her obligations and shirked them. As shown in the above charts, the Defendant maintained QuickBooks records which calculated the employment taxes owed and she also filed the Forms W-3 reporting the purportedly withheld tax to the Social Security Administration.

The Defendant willfully accounted for and withheld the employment taxes and then kept them for herself and her company. These funds were not hers to do with as she wished, whether it was for personal expenditures or to continue funding her business. Americans can spend *their* money as they see fit. However, they cannot steal *other people's* money—in this case their employees' payroll taxes—to subsidize their individual expenses or prop up their failing business. *See Davis v. United States*, 961 F.2d 867 (9th Cir. 1992) (affirming conviction in which "The federal government is in effect subsidizing the corporation's recovery by foregoing collectible tax dollars."); *Thibodeau v. United States*, 828 F.2d 1499, 1506 (11th Cir. 1987) (per curiam) ("The government cannot be made an unwilling partner in a business experiencing financial difficulties."); *Mazo v. United States*, 591 F.2d 1151, 1154 (5th Cir. 1979) ("The United States

9

may not be made an unwilling joint venturer in the corporate enterprise.").

The Sentencing Commission has recognized that "[t]ax offenses, in and of themselves, are serious offenses." § 2T1.1 cmt. background. In addition to being a serious offense, paying over withheld trust fund taxes is one of the most basic responsibilities an employer has to the government. It is also a simple responsibility; it does not involve a complex set of IRS regulations. Unfortunately, because of this simplicity, not paying employment taxes is an easy crime to commit and provides employers with ready access to funds that are simply not the employers to do with as they please. The tax laws do not permit an employer to choose to use the monies held in trust for the United States for other purposes, such as to pay business expenses.

Moreover, tax offenses are not victimless crimes. For employment tax violations, when a business owner fails to pay their employment taxes, they victimize other parties. First, the United States loses tax revenue that it depends on. Once the payroll taxes are withheld from the employees' wages, the United States is required to credit the amount withheld against the employees' individual tax liabilities, regardless of whether such taxes are actually paid to the United States. 26 U.S.C. § 31(a); 26 C.F.R. § 1.31(a); *Slodov v. United States*, 436 U.S. 238, 243 (1978).

Thus, the United States suffers a double loss, in that it does not receive the payroll taxes that lawfully belong to the government, and in that it affirmatively pays the Social Security and Medicare contributions for the employees for the delinquent period.

As noted by the Treasury Inspector General for Tax Administration in a report addressing the need to more effectively address employment tax crimes, "[e]mployment tax embezzlement is an especially egregious crime because the employer . . . violates their fiduciary responsibility to remit the taxes on behalf of their employees." *A More Focused Strategy Is Needed to Effectively*

10

*Address Egregious Employment Tax Crimes*, March 21, 2017, Ref. No. 2017-IE-R004, p. 3. The report stated further that "[w]hen employers willfully fail to account for and deposit employment taxes which they are holding in trust on behalf of the Federal Government, they are in effect stealing from the Government." *Id*. at p. 4.

B.        History and Characteristics of the Defendant

The Defendant accepted responsibility, agreed to pay restitution, and has no convictions that trigger criminal history points. This background is appropriately reflected in her Sentencing Guidelines calculations by effectively reducing her offense level by five points. The facts do not merit a lower sentence within the Guidelines range, and any further reduction would skew the balancing the Court must conduct in issuing a sentence that promotes justice, as directed by 18 U.S.C. § 3553.

Putting her criminal history into context, this is not a case where the defendant's conduct was aberrant or representative of a brief and isolated lapse in judgment. Instead, this "zero-point offender" has been a criminal for multiple years and built her business on the back of her employees' taxes.

Similarly, the Defendant has agreed to plead guilty and pay restitution for her tax crimes, and that acceptance of responsibility is already appropriately accounted for in the Guidelines calculation. Criminals should pay back the money they have taken after they get caught. The Defendant's restitution payment and plea of guilty is indeed the first step towards rehabilitation, but it is not extraordinary in any way and does not merit a departure from the Guidelines calculation.

C.     <u>The Need to Promote Respect for the Law and the Need to Afford Adequate Deterrence to Criminal Conduct</u>

One of the paramount factors the Court must consider in imposing a sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). "[T]axes are the lifeblood of government, and their prompt and certain availability an imperious need." *Bull v. United States*, 295 U.S. 247, 259 (1935). Criminal tax prosecutions serve not only to punish the violators, but also to promote general deterrence and encourage all taxpayers to abide by the rules and pay their fair share of taxes. We respectfully submit that a meaningful term of imprisonment—that is, within the Guidelines range—is essential to achieve the goals of general and specific deterrence, especially given the nature and history of this defendant.

A sentence within the Guidelines range is appropriate and necessary to provide the requisite level of specific and general deterrence. 18 U.S.C. § 3553(a)(2)(B).

First, the Defendant's conduct is unfortunately replicable. Absent a meaningful term of imprisonment, general deterrence—"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). Employment taxes are a tempting source of funds for small business owners like the Defendant. When such officers make the decision to commit tax fraud, they tilt the playing field in their favor, thereby harming the many diligent businesses who faithfully comply with their tax obligations—succeeding or failing on their merits, rather than by cheating the system. It is therefore critical for this sentence to show that there are real and significant consequences to giving into this temptation.

Second, the Defendant's conduct, like many government frauds, is both difficult to detect and highly lucrative unless there is a meaningful threat of a lengthy term of incarceration. Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence. *See generally*, Louis Kaplow and Steven Shavell, "Fairness Versus Welfare," 114 Harv. L. Rev. 961, 1225-1303 (2001). "Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect." Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 EMORY L.J. 265, 321 (2011-2012). Indeed, "[d]efendants in white collar [cases] often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). It is this type of mentality that is most amenable to deterrence. *See generally United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014) ("[D]eterrence is an important factor in white-collar cases, where the motivation is greed. . . . [W]e have set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others.").

Moreover, strong deterrence is particularly crucial in a case such as this where the defendant—an employer—controls the ability to withhold taxes from her employees and pay them over to the IRS. These withheld funds are to be held in trust by the employer and not used for their own wants and needs. It is tantamount to theft, and it is important that the sentence reflects the importance of paying over these withheld taxes to the IRS. Employees have no practical method to police their employers, so the threat of criminal consequences provides the only incentive for employers to pay over the taxes as required.

13

Third, general deterrence is an essential means of minimizing the ever-increasing amount of money estimated to be lost each year through tax fraud. The United States tax system relies on voluntary compliance. *See United States* v. *Ture*, 450 F.3d 352, 357 (8th Cir. 2006) ("The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system"). The IRS's most recent study of tax compliance estimates that only 85% of individuals are compliant, leaving a yearly tax gap of $496 billion in unreported and uncollected taxes.[4] The underreporting tax gap for employer FICA and FUTA taxes is estimated to be $29 billion, which represents 6% of the total tax gap.[5]

The Fourth Circuit has explicitly endorsed the vital importance of incarcerating tax scofflaws as a means of general deterrence:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010).

In sum, the Government cannot ensure compliance with the Internal Revenue Code if the general public believes there are no meaningful repercussions for failing to comply with tax laws and regulations. Sentencing the Defendant to a significant term of incarceration will convey the message to others that systematic and repeated failure to pay payroll taxes will be met with harsh punishment.

## IV. RESTITUTION

Wymer has agreed to pay restitution to the IRS of $973,727.04. Pursuant to 18 U.S.C. §

---

[4] *Tax Gap Estimates for Tax Years 2014-2016*, Publication 1415 (Rev. 10-2022), *available at* https://www.irs.gov/newsroom/the-tax-gap.
[5] *Id*.

14

3663(a)(3) the Court should order to pay the restitution to the IRS as agreed to by the parties.

## V.  CONCLUSION

For years, the Defendant undermined the U.S. tax system and failed to pay over almost $1 million in employment taxes that she withheld from the paychecks of her employees. This serious crime deserves serious punishment. Therefore, the United States respectfully recommends that this Court sentence the Defendant to a within-Guidelines sentence of 24 months in prison, a three-year term of supervised release, and restitution payable to the IRS in the amount $973,727.04. Such a sentence is appropriate in this case and consistent with the U.S. Sentencing Guidelines and the factors enumerated in 18 U.S.C. § 3553(a).

RESPECTFULLY SUBMITTED, this the 6th day of July, 2026.

RUSS FERGUSON
UNITED STATES ATTORNEY

/s/ Caryn Finley
CARYN FINLEY
Assistant United States Attorney
New York Bar Number: 3953882
caryn.finley@usdoj.gov

s/ Daniel Lipkowitz
DANIEL LIPKOWITZ
Trial Attorney, Criminal Division
DC Bar Number: 90007353
daniel.lipkowitz@usdoj.gov

Attorneys for the United States
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, NC 28202
(704) 344-6222 (office)
(704) 344-6629 (facsimile)

15

<u>CERTIFICATION</u>

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 6th day of July, 2026.

s/ Caryn Finley
Assistant United States Attorney

16