THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF
AMERICA,
      Plaintiff,

v.                                   CASE NO.: 5:25-CR-00043-001

BRENDA WYMER,
      Defendant.

## WYMER SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

Brenda Wymer, through counsel, submits this Sentencing Memorandum and Motion for Downward Variance. Ms. Wymer requests this Honorable Court to exercise its discretion under 18 U.S.C. § 3553(a) and, pursuant to *Gall v. United States*, 552 U.S. 38 (2007), vary downward from the applicable sentencing guidelines range[1] to a sentence of probation, which is sufficient but not greater than necessary to achieve sentencing objectives, for the following reasons:

    A. Ms. Wymer suffers from numerous health conditions, including life-threatening pulmonary embolisms, blood clots, and anemia, the treatment, monitoring, and care of which will be ineffective in BOP;

    B. Ms. Wymer's behavior, while inexcusable, was motivated by self-preservation after suffering documented physical and emotional abuse by her ex-husband for 18 years;

    C. Ms. Wymer took immediate responsibility for her actions with her pre-indictment plea and demonstrated she is genuinely remorseful by being prepared to make an initial restitution payment of $200,000, making plans for further payments, and engaging in rehabilitation efforts;

    D. Ms. Wymer has been sufficiently deterred by the loss of her nursing license and business, and others will be similarly deterred;

---

[1] The government and probation assert, with application of the abuse of trust enhancement, the appropriate guidelines range is 24 to 30 months imprisonment. Ms. Wymer respectfully contends, as detailed in her Objections to the Draft Presentence Report (Dkt. No. 20), the enhancement does not apply, and the appropriate applicable guidelines range is 18 to 24 months imprisonment, based on an offense level of 15 and Criminal History Category I.

1

E. Ms. Wymer is 66 years old, has no prior criminal record despite a difficult upbringing, and has had exemplary behavior while out on bond; and

F. A downward variance is necessary to avoid sentencing disparities in similar tax cases.

<u>DISCUSSION</u>

**A. A downward variance to probation is necessary to provide Ms. Wymer with the ability to receive medical care and treatment in an effective manner.**

Ms. Wymer, 66 years old, suffers from critical health concerns which require constant monitoring and treatment to control and prevent fatal consequences. This care and treatment will be ineffective in BOP. *See* 18 U.S.C. § 3553(a)(2)(D) (requiring consideration the need for the sentence imposed "to provide the defendant with needed… medical care … in the most effective manner").

In November 2025, after her pre-indictment plea in this matter, Ms. Wymer was urgently hospitalized on two separate occasions. On November 6, 2025, Ms. Wymer was hospitalized with nonocclusive thrombus right popliteal vein, occlusive thrombus right posterior tibial vein, pulmonary embolisms in both lungs, and mild heart strain. (Exhibit E, Hugh Chatham Health Nurse's Notes at 1–3)[2]. A pulmonary embolism ("PE") occurs when a deep vein blood clot forms in the vein and breaks off and travels to the lungs, blocking the blood vessels there. *See* THROMBOEMBOLISM, https://www.health.harvard.edu/a_to_z/thromboembolism-deep-vein-thrombosis-and-pulmonary-embolism-a-to-z (last visited July 6, 2026). A PE is a serious medical condition and can result in symptoms ranging from fainting spells to sudden death. *Id.*

Thereafter, on November 16, 2025, Ms. Wymer went to the hospital after she woke from her sleep with severe left-sided chest pain. (Ex. E at 4). Doctors determined that the chest pain was

---

[2] Exhibit E is a composite exhibit of nursing notes from Ms. Wymer's hospital visits in November of 2025.

likely a complication of the PEs for which she was treated on November 6, 2025. She was admitted, and on November 18, 2025, Ms. Wymer underwent a coronary angiography and left heart catheterization. (Exhibit C, Novant Health Records at 6). Ms. Wymer was discharged on November 19, 2025, and recommendations after the procedure and discharge included (a) restarting Eliquis (a blood thinner that requires monitoring for risk of extreme bleeding); (b) beta-blockers for stress induced cardiomyopathy; and (c) months of outpatient cardiology follow up.[3] (Ex. C at 2).

Unfortunately, Ms. Wymer's medical condition has deteriorated since November. On May 21, 2026 during a follow-up appointment regarding her PEs, she was directed to the Emergency Room by her physician due to an extremely low hemoglobin level of 5.6, indicating severe, life-threatening anemia where oxygen is not being delivered throughout the body as required.[4] This level was confirmed at the hospital, and she received two units of blood yet remains anemic and requires monitoring and follow-up care to determine the source of the loss of blood. (Exhibit G, Hugh Chatham Health Records at 3–6, 9–12).

On May 30, 2026, Ms. Wymer went to the Emergency Room again due to symptoms of shortness of breath, chest tightness, and bilateral leg pain. She was diagnosed yet again with blood clots, this time in several locations in both legs (Ex. G at 13, 15–18). Had these not been caught, they could have broken off and traveled their way to her lungs, resulting in potentially fatal PEs

---

[3] Her sister, Alesia emphasized that Ms. Wymer "takes multiple long-term medications, one of which costs several hundred dollars without insurance coverage" and notes that Ms. Wymer is "functioning at 20% of her previous capacity." (Ex. D at 3).

[4] *See What to Know about Hemoglobin Levels*, Medical News Today, https://www.medicalnewstoday.com/articles/318050#faq (last visited July 6, 2026) (citing Badireddy, Madhu and Krishna M. Baradhi, Chronic Anemia, National Library of Medicine National Center for Biotechnology Information, August 7, 2023, https://www.ncbi.nlm.nih.gov/books/NBK534803/ (last visited July 6, 2026)).

for the second time. Repeat thromboses and PEs are not uncommon and are more likely to happen again in patients who have had them, as has occurred with Ms. Wymer.[5] Ms. Wymer was also diagnosed with pneumonia and pulmonary edema and remains anemic. (Ex. G at 15–18).

As a result of the life-threatening PEs, anemia, and repeat thromboses, Ms. Wymer has chest pain and is extremely short of breath, including when sitting up and walking short distances. She showers in stages, lying down after each stage to catch her breath. She has numerous follow-up doctors' appointments (with a pulmonologist, hematologist, and primary care physician) to determine causes and treatment of her ongoing symptoms and monitor her to ensure she does not experience more life-threatening medical issues. (Ex. G at 3–5, 15–18).

Ms. Wymer has also been diagnosed with multiple sclerosis ("MS"), which causes her severe fatigue. (*See* Ex. G at 3). Additionally, Ms. Wymer suffers from edema in both ankles and feet, dyspnea, chronic obstructive pulmonary disease (COPD), sleep-related hypoxia, fibromyalgia, ocular migraines, and preexisting neck and back injuries, which further complicate Ms. Wymer's medical needs, treatment, and monitoring. (Ex. G. at 1, 3).

With such numerous, complex, and serious medical issues, BOP will be unable to provide the constant assistance and monitoring Ms. Wymer requires to prevent serious illness and potential death. The litigation and monitorship following the closure of FCI-Dublin are instructive of the kind of medical "care" the Courts can anticipate women sent to BOP will receive. *See* Exhibit H, First Public Monthly Status Report (Mar. 31, 2025 – Apr. 30, 2025) *Cal. Coal. for Women*

---

[5] *See* PULMONARY EMBOLISM; SYMPTOMS, CAUSES, RISK FACTORS, AND TREATMENT, Harvard Health Publishing Harvard Medical School (https://www.health.harvard.edu/diseases-and-conditions/pulmonary-embolism-symptoms-causes-risk-factors-and-treatment#:~:text=You%20also%20are%20at%20higher,another%20one%20within%2010%20years) (last visited July 6, 2026) ("About 33% of people who had a DVT or PE will have another one within 10 years.").

*Prisoners v. U.S. Federal Bureau of Prisons* (N.D. Cal.) (pursuant to Consent Decree) at 4–25. The monitorship documents systemic issues regarding inadequate and untimely medical care and treatment for female inmates incarcerated in BOP facilities, including failure to adequately follow changes in medications or changes to class, dose, or route of administration, lack of timely follow up for chronic medical problems, lack of standardized processes for monitoring requests for medical services, inconsistent adherence to policies that grant indigent inmates the ability to receive over the counter medications when they are unable to afford them, and lack of communication with inmates regarding diagnostic results, treatment plans, and follow-up appointments. *Id*. at 17–22. These deficiencies in provision of medical treatment could prove deadly for Ms. Wymer, as they did for Frederick Mervin Bardell, as demonstrated by an investigation by the OIG.  *See* U.S. Dep't of Just., Off. of Inspector Gen, *Investigation and Review of the Federal Bureau of Prisons' Conditions of Confinement and Medical Treatment of Frederick Mervin Bardell and Related Representations to the Court* (Jan. 6, 2026), https://oig.justice.gov/sites/default/files/reports/26-007.pdf (finding that death of federal inmate Bardell was due to delay in his medical care and treatment at BOP based on a number of factors, including inadequate procedures to ensure that "inmates with serious medical needs were seen regularly by BOP medical providers). Probation will sufficiently punish Ms. Wymer for her conduct while also allowing her to effectively care for herself.

### B. Ms. Wymer's offenses were motivated by fear of her ex-husband, who physically and emotionally abused her for years.

Ms. Wymer had the misfortune of meeting and marrying her alcoholic ex-husband in 1995 and suffered for well over eighteen years from both emotional and physical abuse. Her ex-husband isolated her from family members and friends, calling her "trailer trash" and "a piece of shit". (Exhibit A, Letter from Dr. Robert Custrini at 2). He grabbed her face to ensure she looked at him

when he scolded her, often causing her bruising. *Id.* He also yanked her around by her arms causing bruising, *id.*, and he poisoned her multiple times during the marriage.[6] He owned a plethora of guns and made sure Ms. Wymer knew he would be ready to use them, telling her that she may be "shot" if she continued to get out of bed during the night. *Id.* One day, he raped her and sarcastically thanked her when he was finished. *Id.*

Despite suffering from depression due to her ex-husband's abuse, Ms. Wymer ultimately escaped her abuser, *literally* fleeing in the middle of the night to do so. After fleeing, Ms. Wymer obtained a domestic violence protective order and filed for divorce. In her Complaint and Motion for Domestic Violence Protective Order, she stated that her ex-husband makes jokes about her death and about "throwing [a] knife at [her] back while [she is] running away", walks around "with loaded firearms", and keeps "loaded handguns in [his] coat pockets." (Ex. F at 3). Ms. Wymer also recounted an occasion when a coworker was hospitalized after eating candy provided by Ms. Wymer's husband that had been meant for consumption by Ms. Wymer. *Id.* Ms. Wymer's eldest sister stated in her letter of support to this Court that "[Ms. Wymer] was given a protective order and twenty-four loaded guns were found in their house in [Ms. Wymer's ex-husband's] possession as he was waiting for her return when the police arrived." (Exhibit D, Character Letters at 1).

In 2014, the year after Ms. Wymer divorced her abusive ex-husband, she started her home healthcare agency but often failed to go to work because she was "hiding out" from her ex-husband out of fear. Ms. Wymer was responsible for "promoting" the business and obtaining referrals, but her fear of what her ex-husband might do to her prevented her from doing so, and the business suffered. (Ex. A at 3–4). To this day, "[s]he is terrified of running into him, and avoids going out

---

[6] Ms. Wymer's medical records confirm that in or about June 2007, she was poisoned with arsenic (Exhibit F, LabCorp Report and Complaint and Motion for Domestic Violence Protection Order at 1–2).

of her home unless circumstances necessitate it." *Id.* at 3. Struggling to keep her mental health in check and business profitable, she did not pay the employment taxes she knows she should have. She "dug a hole" with an intent to "catch up and pay what she owed", but her initial action snowballed into an insurmountable burden that she avoided in hopes that it would simply go away. *Id.*

While Ms. Wymer accepts full responsibility for her actions, the mental health treatment she has sought to address the fear and anxiety that motivated her actions has demonstrated that her intent was not greed or self-enrichment but instead self-preservation. Dr. Robert Custrini, a Licensed Psychologist and Ph. D. who Ms. Wymer sought treatment from while out on bond, found that:

> Ms. Wymer readily acknowledges that her decision to withhold the payroll taxes was a conscious one and that she knew her actions were illegal. She also recognizes that she will be held accountable for these actions. However, it does not appear that they were taken for financial gain. She did not hold on to the money to enrich herself or others within her personal sphere. Rather, it appears that she was incapacitated by her anxiety and that her primary motive was one of self-preservation. She was – and still is – reluctant to fully engage with the world for fear of an encounter with her ex-husband. So rather than dealing with the reality of her indebtedness to the IRS, she engaged in a fairly primitive form of denial and told herself that the problem would resolve itself someday.

(Ex. A at 4).

Pamela J. Meeds, Psy. D., P.A., Licensed Psychologist, whom Ms. Wymer receives treatment from while out on bond, shared Dr. Custrini's sentiments and diagnosed Ms. Wymer with major depressive disorder and provisional post-traumatic stress disorder. (Exhibit B, Treatment Summary of Brenda Wymer by Dr. Pamela Meeds at 1). In her report, Dr. Meeds found that:

> "[During Ms. Wymer's marriage to her abusive ex-husband,] [h]er health became compromised, her business began to suffer, income flows decreased and she became overwhelmed. Her tendency toward avoidance at home generalized to

> work. She began delaying decisions, restricting her movements, isolating herself, and distancing herself from emotional support and business assistance. Avoidance of the fear [sic] led to suppression, compartmentalization, and denial of problems. She's been compartmentalizing if not dissociating painful emotions and abuse memories since childhood."

(Ex. B at 1).

### C. Ms. Wymer genuinely regrets her actions and has taken immediate, concrete steps towards rehabilitation and making restitution.

For the good of herself and society, Ms. Wymer is in denial no more. She takes full responsibility for her conduct and entered into a pre-indictment plea agreement with the government when the IRS confronted her. While on bond, she has engaged in mental health counseling with Dr. Meeds and Dr. Crustini to deal with her trauma and understand the behavioral patterns which led to this juncture to ensure this never happens again.

As put by her long-time friend, Daniel Clark: "[Ms. Wymer] fully acknowledges the gravity of recent events and has been forthright about their impact on her. Her reflection illustrates a commitment to personal growth and learning from this experience." (Ex. D at 10). Another friend, Dixie Bourne, who has known Ms. Wymer for over twenty (20) years, states that Ms. Wymer's "remorse is unmistakable" and Ms. Wymer has not made "excuses or [tried] to shift blame; instead [] express[ing] regret, and a deep understanding of how serious things are." (Ex. D at 11).

Ms. Wymer is also committed to paying the restitution she owes. To that end, Ms. Wymer has already set aside in counsel's trust account $172,500, and prior to sentencing intends to set aside an additional $27,500, for a total of $200,000 towards the $973,727.04 owed to the IRS. (Dkt. No. 22 ¶ 17). As to further payments, Ms. Wymer intends to obtain gainful employment as soon as possible after sentencing. She has a certificate in laser hair removal and a passion for

8

design and intends to explore creating and selling embroidered clothing or quilted goods. However, at the moment, Ms. Wymer's health is prohibiting her from moving forward with these plans.

### D. Ms. Wymer's history and characteristics support a downward variance.

While no excuse, the offense conduct here is an anomaly for Ms. Wymer, who worked her way up from incredibly difficult circumstances to build a good life for her and her son. Ms. Wymer was born in 1959 in Marion, Virgina, grew up in extreme poverty, and experienced repeated trauma from a young age. She is the second eldest of four children and maintains close contact with her three sisters (each of whom have written letters of support on her behalf included in the composite Ex. D at 1–4). Her family home had no running water or working bathroom, and her mother was frequently ill. Ms. Wymer was expected, at a very young age, to assist in the care of her two younger sisters and to babysit a one year old girl with *Spina Bifida* that was paralyzed from the waist down. (*See* Dkt. No. 22 ¶ 40).

As a child, Ms. Wymer was sexually abused by her uncle, and at the age of twelve, raped by a family friend. These experiences of sexual abuse and trauma at the hands of those entrusted with her care, compounded by the sexual abuse by Ms. Wymer's ex-husband, heighten concerns with re-traumatization and risk of sexual abuse if incarcerated and merit a downward variance. *See, e.g.*, *United States v. Ruff*, 998 F. Supp. 1351, 1356–57 (M.D. Ala. 1998) (granting downward departure because petitioner was "vulnerable to sexual assault and victimization"); *Koon v. United States*, 518 U.S. 81, 111–12 (1996) (holding the district court did not abuse its discretion by considering susceptibility of abuse when granting downward departure). Concerns of re-

9

traumatization and sexual abuse during incarceration are well-founded, as women are three times more likely to be sexually victimized by prison or jail staff than men.[7]

At seventeen, Ms. Wymer married her high school sweetheart, had her son, and almost immediately became the sole financial provider because her then-husband refused to work. To make ends meet, Ms. Wymer worked in three (3) different factories and held various jobs, including fast-food restaurants, a gift shop and a certified nursing assistant. Her first marriage ended due to her husband's repeated infidelity, including affairs that produced two children. Alesia Thomas, Ms. Wymer's younger sister, corroborates that Ms. Wymer had a difficult childhood, full of "significant responsibilities" compounded by the fact that she married "young" and was the sole financial provider for her family. (Ex. D at 2).

After her divorce at age 29, Ms. Wymer did not succumb to devastation. Instead, as a single mother, she went to college late in life to provide a better life for her and her son. In 1994, while managing her son's needs, she successfully earned an Associate Degree in Applied Science in Nursing at Wytheville Community College and then worked as a registered nurse at Alleghany Memorial Hospital.

Six months later, she began working at a nursing home as a registered nurse. Self-described as a "workaholic," Ms. Wymer quickly "rose up the chain" from Care Plan Coordinator to Assistant Director of Nursing, and Director of Education. During this time, she unfortunately met and married her abusive ex-husband, which derailed her plans and left her severely anxious and depressed, as described in part B above. (Dkt. No. 22 ¶ 40).

---

[7] U.S. Dep't of Just., Bureau of Just. Stat., *Substantiated Incidents of Sexual Victimization Reported by Adult Correctional Authorities, 2016 – 2018*, at 12 (2020), https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/sisvraca1618.pdf (finding that women made up just 10% of the combined prison and jail population at the time, although accounted for 27% of all victims of staff sexual misconduct and sexual harassment).

While the government contends that Ms. Wymer "previously willfully failed to pay over employment taxes at another company" based on a report by an employee concerning "a tax-related incident that occurred prior to 2017," it fails to note the alleged incident occurred in 2013; the other company was co-owned by her abusive ex-husband; and the alleged incident was not included in the charges against her.

Fortunately, Ms. Wymer has numerous supportive friends and family, who submitted letters to the Court regarding her character, accountability, and firm desire to rehabilitate herself and address mental and physical health issues that have been ongoing for many years. (Ex. D). Ms. Wymer's sister, Lora Wymer describes Ms. Wymer as "kind, loving, and generous" person who "puts other people's needs before her own." (Ex. D at 4). Ms. Wymer is the type of person who "brings food to her eighty-six (86) year old neighbor who lives alone"—a quiet act of kindness and generosity, without expectation of any quid pro quo or return. *Id.*

Ariel Diaz is Ms. Wymer's niece and is employed as a police officer with the United States Capitol Police. (Ex. D at 7). Ariel describes Ms. Wymer as her "second mother" who always "encouraged and supported" her. Ariel recalls a time when she had just started her job, had no money, and needed assistance. *Id.* Ms. Wymer allowed Ariel to stay in her home rent free, and covertly "slipped" money into Ariel's purse, knowing that Ariel needed the funds but would never ask Ms. Wymer for help. *Id.*

Bobbie Clark is a close friend of over twenty (20) years. Her letter of support describes Ms. Wymer as "dependable, hardworking, and supportive of everyone around her." (Ex. D at 9). Bobbie states that "She is someone who steps in when others are struggling, offers to help without being asked, and always tries to make things easier for her coworkers, friends, and family." *Id.*

11

Consistent with her giving nature, Ms. Wymer has played an integral role in assisting her son with raising his minor daughter and she strongly desires to maintain her role in her son and granddaughter's lives. Ms. Wymer's niece, Ms. Diaz, stated in her letter to the Court that

> [Ms. Wymer's granddaughter's] mother is not in the picture and does not contribute financially. [Ms. Wymer's son] is a non-violent registered sex offender which has prevented him from being allowed to attend [his daughter's] school functions. [Ms. Wymer] took [her granddaughter] to these school functions which allow her to have as much of a normal life as possible. [Ms. Wymer] now helps [her granddaughter] with online schoolwork as she is home-schooled.

(Ex. D at 8). The loss of Ms. Wymer's support to her granddaughter would be detrimental to Ms. Wymer and her family.

Women involved in the criminal justice system face distinct challenges, which are often overlooked in a system designed for men, and are "shaped by trauma, economic hardship, caregiving responsibilities and unmet behavioral needs." Women's Just. Comm'n Council on Crim. Just., *Executive Summary* (Oct. 2020), https://reports.counciloncj.org/wjc-report/executive-summary. In fashioning an appropriate sentence, this Court should account for the risks and needs specific to female offenders and respond to and consider their distinct circumstances. *See id.* (recommending that courts expand responses to and consideration of women's distinct circumstances at charging and sentencing in response to a finding that well-designed diversion and community-based programs can address drivers of justice system involvement and reduce recidivism for women). Here, Ms. Wymer's circumstances involve a history of trauma and abuse, mental health diagnoses, and serious medical issues. BOP is ill-equipped to adequately meet the needs of or effectively treat Ms. Wymer. (*See* Ex. H at 4–25).

### E. The loss of Ms. Wymer's nursing license and business has deterred Ms. Wymer from reoffending and will deter others from similar misconduct.

As described above, Ms. Wymer worked tirelessly as a single mother to earn her nursing degree and had a true passion for her vocation. As a result of her conduct, however, Ms. Wymer forfeited her nursing license, prohibiting her from ever becoming a nurse again—a career she earned despite great struggles. Her business, which she had opened after leaving her abusive ex-husband, has also been closed. She stands convicted of a felony, which has substantial collateral consequences. Her conviction discourages others from engaging in business with her in the future. These collateral punishments have deterred Ms. Wymer and will deter others from reoffending. Ms. Wymer's prosecution, early guilty plea, public conviction, and payment of restitution sends a powerful deterrent message to similarly situated individuals who might consider failing to pay employment taxes. For a 66-year-old first-time offender in extremely poor health, the marginal deterrent value of a custodial sentence versus a non-custodial or reduced sentence is minimal.

Additionally, as a zero-point offender at the age of 66, Ms. Wymer is unlikely to reoffend. *See* RECIDIVISM & FEDERAL SENTENCING POLICY, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/rg_recidivism-series.pdf (last visited July 6, 2026) (noting that people with no criminal history recidivate at an exorbitantly low rate and that the risk of recidivism falls from nearly seventy percent (70%) for a 20-year-old offender, down to sixteen percent (16%) for an offender "older than sixty").

### F. Ms. Wymer should receive a downward variance to avoid sentencing disparities.

In tax cases, downward variances are the norm. In 2024, over half of offenders who were charged with tax fraud offenses received a downward variance. *See* QUICKFACTS TAX FRAUD,

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Tax_Fraud_FY24.pdf (last visited July 6, 2026).



**Sentences Relative to the Guideline Range**

Fiscal Year 2024

Under the Guidelines Manual (45.2%)

Variances (54.8%)

| | |
|---|---|
| Within Range | 28.9% |
| Substantial Assistance | 12.4% |
| Other Downward Departure | 3.7% |
| Upward Departure | 0.3% |

In fact, 34 percent of individuals convicted of tax fraud were sentenced to non-incarceratory sentences, such as the one Ms. Wymer requests. *Id.*

Additionally, as further detailed in the objections to the draft PSR (Dkt. No. 20 at 5), application of the two-level abuse of trust enhancement would result in sentencing disparities, as the defense has found no cases in the Western District of North Carolina where the court imposed or the government sought such enhancement in past criminal tax prosecutions for violations of Title 26, Section 2702. And the government has submitted no such cases in its sentencing memorandum filed today where it sought the enhancement, despite previously prosecuting numerous defendants under Title 26, Section 2702 as "the sole owner [of the business] and aware of and responsible for [the business's] failure to pay [employment] taxes to the IRS," which is its stated reason for seeking the enhancement for Ms. Wymer. (Dkt. No. 26 at 2).

14

<u>CONCLUSION</u>

For the reasons stated above, the defense requests that this Court grant Ms. Wymer a downward variance and impose a sentence of probation.

Case 5:25-cr-00043-MEO-DCK     Document 27     Filed 07/06/26     Page 15 of 18

Respectfully submitted, this the 6th day of July 2026.

By: _s/_ Tanisha Palvia

WALTER A. REYNOSO
Florida Bar No. 525693
LAW OFFICES OF WALTER A. REYNOSO
The Minorca
2030 S. Douglas Road
Suite 214
Coral Gables, Florida 33134
Tel: (305) 441-8881
walter@lawreynoso.com

Tanisha Palvia
North Carolina Bar No. 43117
MOORE AND VAN ALLEN PLLC
100 N. Tryon St. #4700
Charlotte, NC 28202
(704) 331-1000
tanishapalvia@mvalaw.com

16

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, the foregoing document was e-filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of filing to counsel of record listed as receiving e-mail service.

/s/ Tanisha Palvia

17

# ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION

I hereby certify the following:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 6, 2026

/s/ Tanisha Palvia